```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :        CRIMINAL ACTION
                                :
        v.                      :
                                :
KYSEM HUMPHREY                  :        NO. 25-198
```

<u>MEMORANDUM</u>

Bartle, J.                                          October 1, 2025

The Government has indicted Defendant Kysem Humphrey on one count of possession of a machinegun in violation of 18 U.S.C. § 922(o). Before the court is the motion of Defendant to suppress evidence (Doc. #23). The motion to suppress not only includes the firearm seized from his person but also its ammunition and parts, his custodial statements and his DNA and cellular phone evidence. The court held an evidentiary hearing on the motion and now makes the following findings of fact and conclusions of law.

I

The government presented two Southeastern Pennsylvania Transportation Authority (SEPTA) Police Officers and two Philadelphia Police Officers as witnesses. The court finds the testimony of these police officers to be credible. The parties also introduced video and audio evidence from the officers' body cameras.

At about 5:00PM on Tuesday, December 17, 2024, passengers exiting a SEPTA elevated train at the Frankford

Transit Center ("FTC") in Philadelphia reported to SEPTA Police Officer Richard Galanti that there were "kids on the platform with a weapon, [a] gun, trying to rob them."  At least two individuals provided him this information, including a woman with a child.  The informants confirmed to him that there were multiple assailants, although he did not recall whether the informants stated a specific number.  Officer Galanti received additional information from SEPTA radio and passersby that the assailants were African American and wearing black clothing.

      A few minutes later at 5:23PM, SEPTA Police heard over Philadelphia Police radio a 911 call that there had been an assault at the FTC near the SEPTA Route 66 Bus stand by three males who were armed with a gun and a knife.

      When SEPTA Police Officer Ty Castellano heard the 911 call at the FTC, he approached Officer Galanti and his partner, Officer Davila.[1]  The latter reported to Officer Castellano that "two different mothers stated that there were three juveniles with a gun."

      Officer Galanti, Officer Davila and Officer Castellano shortly thereafter stopped and patted down three young African American males in black clothing whom they saw together at the FTC.  None of the three had a weapon other than a pocketknife.  Officer Davila stated that there were reports of a robbery and

---

1. The first name of Officer Davila is not in the record.

-2-

asked if they witnessed it. The three young males replied that they had not but told the officers that they saw three "lil bros" wearing ski masks board the 66 Bus after they "came out of nowhere." They described the three boarding the bus as a "tall boy, a short fat boy, and another one" wearing ski masks. One was wearing spider pants. Officer Galanti relayed that information over SEPTA Police radio.

Shortly after the conversation with the three young men, the officers were in contact with a man near the 66 Bus stand at the FTC who complained he had been the victim of an assault. Officer Castellano conducted a field interview of the complainant, whom Officer Castellano described as "visibly upset" and intoxicated. The complainant informed the officers that his alleged assailants were three "guys" who were black and approximately 19 years old. He also noted they were wearing all black clothing, masks, had a gun and a knife, and "scattered" after the assault. Officer Castellano took down the complainant's name, phone number and license number and sent him to be evaluated by medical professionals.

At 5:23PM, Philadelphia Police Officers Leo Breslin and Abdel Kanan also heard and responded to the 911 radio call about the assault at the FTC. After they arrived at the FTC, the SEPTA police officers recounted to Officer Breslin that a male was assaulted and the assailants boarded the 66 Bus. At

least one of the three young men who had been patted down reported to Officer Breslin that the alleged assailants got on the 66 Bus and one of the three was wearing spider pants. Officer Kanan was also told by passersby that three males got onto the 66 Bus, and one was wearing pink pants and a spider hoodie.

After receiving this information, Officers Breslin and Kanan left the FTC around 5:27PM. They drove their marked police vehicle north along Frankford Avenue, the route of the 66 Bus, to catch up with it. While on their way, they learned via police radio that the Route 66 Bus that had just departed from FTC was bus numbered 801.

Officers Breslin and Kanan found that 66 Bus at Frankford and Cottman Avenues, 2.5 miles and multiple bus stops from the FTC. They stopped and boarded it at 5:37PM. They saw Defendant Humphrey sitting with two other young, African American males. One of the three males was wearing spider pants. That individual, Jayquan Jett, was also wearing a black jacket, black undershirt, and a ski mask. Humphrey was wearing a black unzipped jacket, a gray sweatshirt underneath the jacket with a hood up, and a black ski mask underneath the hood. The three males were sitting in proximity and seemed to be together.

Officer Breslin was immediately focused on Jett, the individual in spider pants. Officer Breslin observed that there

was a very large bulge in his jacket and he was also carrying a backpack. Officer Breslin considered the bulge to be suspicious because Jett had not put in his backpack the item or items creating the large bulge.

Officer Kanan approached the third male and asked if he had a gun. The male replied "no" and consented to a search. As no weapons were found, he was allowed to leave the bus.

During this time, at least three other Philadelphia Police officers had boarded the bus, including a police sergeant. Passengers other than the three African American males were allowed to step off the bus.

While Officer Kanan was speaking to the police sergeant and after the search of the third male, another officer discovered that Jett had a gun. Officer Kanan recovered a large firearm hidden in his pants.

Promptly after recovering the weapon from Jett, Officer Kanan quickly patted the front waist area of Humphrey for any weapons but none was found. Simultaneously, Officer Breslin held Jett down on the bus seat to handcuff and arrest him. While being held down, Jett blurted out "call my mom and tell her I love her." Humphrey, who was sitting near Jett and had just put his hands up, did not respond to what Jett had said. Officer Kanan took Jett's request that a phone call be made to his mother as confirmation that Humphrey was

accompanying Jett.  He then patted down Humphrey again.  This time he felt a bulge on the left side of Humphrey's waist area and recovered a firearm from inside his pants.

Based on their years of experience, the officers described the FTC, its neighborhood, and the vicinity around Frankford and Cottman Avenues to be high crime areas.

## II

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. Once a defendant has challenged the legality of a search or seizure, the burden is on the government to prove that what occurred was constitutional.  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).  If the search or seizure is found to be unconstitutional, the court will suppress any obtained evidence as the "fruit of the poisonous tree."  Wong Sun v. United States, 371 U.S. 471, 484-88 (1963); Nardone v. United States, 308 U.S. 338, 341 (1939).

Generally, a warrant based on probable cause is required for a seizure to be reasonable under the Fourth Amendment.  United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356-57 (1967)).  However, under the "narrowly drawn authority" of Terry v. Ohio, 392 U.S. 1, 27 (1968), an officer without a warrant

"may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (1968)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than a preponderance of evidence, the Fourth Amendment requires at least a minimal level of justification for making the stop." Illinois v. Wardlow, 528 U.S 119, 120 (2000) (internal citations and quotation marks omitted).

To determine whether reasonable suspicion exists, the court must consider the "totality of the circumstances." Robertson, 305 F.3d at 167 (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)). From the totality of the circumstances, the court must determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 266 (2002). The Supreme Court has held "the determination of reasonable suspicion must be made on common sense judgments and inferences about human behavior." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (quoting Wardlow, 528 U.S. at 125). Among the "pertinent factor[s]" that officers may consider are whether the area is a high-crime area and a suspect's "nervous,

-7-

evasive behavior." United States v. Whitfield, 634 F.3d 741, 744 (3d Cir. 2010) (quoting Wardlow, 528 U.S. at 124). Officers may also draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. Robertson, 305 F.3d at 16 (citing Arvizu, 534 U.S. at 266). A trained officer may find reasonable suspicion "based on acts capable of innocent explanation." United States v. Graves, 877 F.3d 494, 499 (3d Cir. 2017) (internal quotation marks omitted).

Our Circuit applies the collective knowledge doctrine to Terry seizures. As stated in Whitfield, 634 F.3d at 746,

> It would make little sense to decline to apply the collective knowledge doctrine in a fast-paced, dynamic situation . . . in which . . . officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis.

Accordingly, reasonable suspicion is evaluated based upon what facts all the responding officers knew collectively at the time of the seizure. Id.

III

The Philadelphia Police did not have a warrant to stop and search the Route 66 Bus or Humphrey. For the stop and

search to be lawful under the Fourth Amendment, it must be classified as a Terry stop based on reasonable suspicion that criminal activity is afoot.  As stated above, the court may look at the information available to all responding officers under the collective knowledge doctrine to determine if there is reasonable suspicion under the totality of the circumstances. Thus, the validity of the search and seizure of Defendant turns on whether the responding Officers Breslin and Kanan had reasonable suspicion based on what the SEPTA officers knew, what they were told and what they observed.

      The five officers collectively had information that three young, African American males wearing black clothing and ski masks were traveling together on Route 66 bus numbered 801 after allegedly assaulting one man and robbing others at the FTC.  The officers were told they were armed with a gun and a knife.  The man who was assaulted spoke to Officer Castellano right after the offense.  The SEPTA passengers who provided the information about the robbers did so contemporaneously.  The three young men who reported that three males had boarded the 66 Bus had just witnessed their departure.  The SEPTA officers relied on statements provided by witnesses "reporting what [they] had observed moments ago, not what [they] learned from stale or second-hand sources." Robertson 305 F.3d at 168 (quoting United States v. Valentine, 232 F.3d 350, 354 (3d Cir.

-9-

2000)).  Additionally, the SEPTA officers could judge the credibility of the informants firsthand.  Multiple face-to-face tips about what witnesses had observed moments before is information on which officers may rely to support reasonable suspicion.  See Valentine, 232 F.3d at 354.

When the officers boarded the bus, they saw three individuals sitting near each other who closely matched the information gathered at the FTC.  The suspects were three young, African American males wearing ski masks and black outer clothing layers.  One was wearing the distinctive spider pants. They were closely congregated, and the officers reasonably believed they were traveling together.  The statement of Jett to call his mother as he was sitting near Humphrey and being arrested further confirmed to the officers that Humphrey and Jett knew each other.  The officers were also aware that they were in a high crime area.  As the Third Circuit previously stated, an individual's presence in a high-crime area is not by itself sufficient to warrant a Terry stop, but "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis." Valentine, 232 F.3d at 356.  Since the three individuals fit the description provided to the officers and were in a high crime area, the officers reasonably suspected that they were the perpetrators of the crimes at the FTC.

Officer Kanan searched Humphrey after recovering a firearm from Jett.  Both common sense and Officer Kanan's experience demonstrate that once a firearm is recovered from a small group congregated together, there is a likelihood that others would be armed.  Indeed, an officer, in determining whether there is reasonable suspicion, may consider reports of an active threat, including the presence and use of dangerous weapons.  Robertson 305 F.3d at 172 (quoting United States v. Nelson, 284 F.3d 472, 483 (3d Cir. 2002)).

Defendant counters that the time lapse between the crimes at the FTC and the police officers boarding the bus as well as the bus's frequent stops along the 2.5-mile stretch provided ample time for the perpetrators to leave the bus.  The officers responded to the 911 call at 5:23PM, left the FTC at 5:27PM, and boarded 66 Bus numbered 801 at 5:37PM.  The drive by Officers Breslin and Kanan to Frankford and Cottman Avenues took approximately ten minutes.  In the defendant's view, these circumstances negate any reasonable suspicion as to Humphrey and his companions.  The defendant contends that Robertson, in which a motion to suppress was denied and on which the Government relies, is distinguishable because the time frame and distance in that case was shorter.

In Robertson, the Court found that officers had reasonable suspicion for stopping and boarding a SEPTA bus

within a few blocks of the alleged crime scene.  305 F.3d at 168-69.  The officers were responding to radio calls describing two robbery suspects as African American males wearing distinctive clothing, at least one of whom was armed.  Id. at 165.  The officers saw two men who fit the description but lost sight of them after a chase.  Id. at 165-66.  At that point, an unidentified van driver informed the officers that the men they were chasing had boarded a SEPTA bus.  Id. at 166.  The officers returned to their police vehicle, tracked down, stopped and boarded that SEPTA bus within two-to-three-minutes thereafter. Id.  They found two men matching the descriptions of the robbery suspects on the bus.  Id.

It is common sense that after perpetrators commit a crime they generally seek to flee not only as quickly as possible but as far as possible from the scene.  Nonetheless, it is true that the perpetrators here did have a few more minutes and greater opportunity to exit the bus than in Robertson. While it is always possible they did so, the Government at this stage does not have to prove beyond a reasonable doubt or by a preponderance of the evidence that Humphrey was a perpetrator of the crimes at the FTC.  Nor does the Government at this point even have to establish probable cause that he did anything criminal.  What is relevant here is the less demanding standard of reasonable suspicion.  The court finds that under the facts

of the case, the relevant time lapse and distance from the FTC to Frankford and Cottman Avenues are not so great as to undermine the reasonable suspicion of the officers directed at Humphrey.

Under the totality of the circumstances, in a "fast-paced, dynamic situation" such as this one, there was reasonable suspicion to stop and search Humphrey. See Whitfield, 634 F.3d at 746. The motion of Defendant to suppress evidence will be denied.